Amanda Clarke, call for a state. Did the council please approach? Good morning, Mr. President and the Defendant of the House. Good morning, Mr. President and the Defendant of the House. And how much time do you wish to reserve for yourself? I'll be with you for 25 minutes. I appreciate it. 25 minutes? Including your rebuttal? I was hoping you'd have five minutes for rebuttal. We have two other cases after you, so that's okay. 20 minutes, depending on the Court's questions. I can get done quicker, so if you need it. Your name? Richard. Brett Wagner. Very good. Okay. Mr. Prime Minister, thank you. May it please the Court. We have tried, as the state has, to thoroughly vet in our briefs the numerous significant issues in this case. To affirm the judgment below in its entirety, the Court must accept the state's position on each of several very significant points. I'm not going to try to exhaust them this morning. I think they've been fairly well vetted in the briefs. But they include whether, prior to 2005, a permit for clean construction and demolition debris was required. If we're right about that, this case is over. If so, whether Janice Inotar had sufficient control and responsibility over the project to support a judgment against her for operating a site without a permit. She clearly did not. Whether John and Janice Inotar as individuals were ever properly before the Court, given the uncontested fact that they never received statutory notice under Section 31 of the Act, that is not a technical issue, it is a jurisdictional one. As to non-toxic materials deposited prior to the 2004 amendment to Section 42E of the Act, whether a mandatory injunction requiring removal of such materials may be issued, given that the site had been closed since 2003 before the amendment was enacted. Under the Supreme Court's decision in Ryan v. Agbro, the answer is no. Whether the unprecedented monetary penalties imposed in this case were an abuse of discretion under the facts of the case and the criteria set forth in Section 42H of the Act, particularly as to the individual defendants. Whether affirmative injunctive relief requiring removal of the hill, even if available as a remedy, we believe it was not, was erroneous, where the hill was undisputably consisted of non-hazardous and non-toxic materials. It was effectively capped, where the mandatory injunctive relief ordered completely ignored the interests of the local community and the environment as a whole. It would have, I'm sorry, it would cause far more pollution and harm to the environment than the hill itself to try to remove it. And there's no, I raise these points when I talk categorically like that. I'm talking about facts that are simply not contestable, or at least they weren't contested. I mean, we didn't have anyone dispute our experts' opinion that taking down this hill, 42,000 truckloads of material, was not going to have an environmental impact. It would be far greater than leaving a fully vegetated hill. Let me just show you. But that's not a question that we need to answer. Why would we need to answer that question, whether it's environmentally hazardous to take it down or not? Oh, because I think that when the court's exercising its discretion, if the court had discretion to order mandatory injunctive relief to remove the hill, certainly a consideration that the court had to take into, certainly a factor that the court had to take into consideration, because the court had discretion not to take down the hill. So if you're an environmental case, and the whole idea here is what's best for the environment, it's not just, you know, if the statute mandated removal of the material, you're right. There'd be no reason why you should even look at that. But the statute doesn't mandate that. In fact, the statute that was in effect at the time we closed down the hill did not permit mandatory removal. That's the Agpro decision. Now, this may not cover all the issues, but I think it covers more than I can cover in 25 minutes. Well, let's talk about the permit, because it's a threshold issue. That's right. And as I look at Mr. Bukowski's letter that your clients rely on, it's addressing a proposal for a recycling facility, which is a very specific process that involves taking clean construction and demolition debris, recycling it, and returning it to the economic mainstream within a short period of time. This 90-foot hill was not the result of recycling, right? That's correct, but let me make one correction, if I may. The recycling facility did not contemplate taking clean construction and demolition debris and recycling it. It contemplated taking general construction and demolition debris, putting it through a recycling machine that we paid a million dollars for, and then recycling the materials that came out of it, whether it was metal, whether it was wood, whether it was other general construction and demolition debris. That was the recycling operation. What's left is clean construction and demolition debris. It was always anticipated that when you perform this function, when you perform this operation, you're going to have nothing left but clean construction and demolition debris. It was never contemplated that it would be removed. Your clients say then, because what's left is clean construction and demolition debris, we can build a hill as high as we want to because that's not regulated under the Act. Well, that's correct. In fact, what Mr. Bukowski's letter said was, if you revise your planned activities to accept only clean construction and demolition debris, scrap metal, and harvested or untreated wood, you will not be required to obtain a permit. But address the definition of waste under the Act. The definition of waste under the Act does contemplate clean construction and demolition debris. We covered that in the Ford Heights case. So that's not an issue anymore. The question is whether or not a permit was required for it. If you literally apply the statute and you say, if it's waste, you need a permit, you're right. But when we take a look at the evidence, including the testimony of Mr. Persiclove in 2007, he was their lead witness. And Persiclove said there was no permit requirement until 2005 or 2006. But he clarified that later to say, as long as you use clean construction and demolition debris as fill up to the level, you don't need a permit, at least not prior to 2005. But when you start going above grade, you need a permit. Well, Representative Amos didn't make that qualification, nor did Bukowski. But Representative Amos didn't make that qualification when she sponsored the legislation in 2005 that required a permit for clean construction and demolition debris. What she said was, this changes the law. You now have to get a permit for it. And one of the reasons this is important, if for no other reason, is because when you take a look at the Bukowski letter and the Bukowski memo to his boss,  and you take a look at what Mr. Persiclove said at trial, and I asked him to repeat the answer, by the way. I mean, I said, do I have this right? I mean, there was no question it wasn't a slip of the tongue. When you take all that into consideration, and then you hear the rhetoric from the state that Mr. Einor was simply flaunting the law and he was just, you know, this was all in disregard of the law. There was plenty of debate going on in this subject. There was plenty of disagreement about what the law required. And that impacts the penalties. He was penalized $500,000 after he did get communication, which I think could reasonably be read, to say that you are not required to have a permit. But he knew at least as of, what's the first date the agency sent JTI notary and Tri-State a notice, 98? 98, 99. So he knew, he and Janice knew both, that the agency disagreed with him. That's correct. He disagreed with the agency. There was an open question for disagreement. That's correct. And by the way, since you mentioned it, and since I'm not going to have time to get into it very deeply, that same notice wasn't given to Mr. Einor or Mrs. Einor. And so I'll leave that issue to the briefs. But I believe that's a jurisdictional requirement in order to bring suit against them. And this argument where the state literally concedes that if the action is brought at the behest of the EPA, yes, you do have to give them notice, but if the Attorney General does it on her own, she doesn't have to give notice, that doesn't make any sense at all. The purpose of the notice requirement is to deal with the EPA. They were not joined in this case, the individuals, until five years after it was filed. They had no reason to believe that they were going to be sued. They were never given notice even in the five-year period from 2000 to 2005 when they were joined as defendants in this case. So I'm glad you touched on that because I think that jurisdictional issue settles matters with respect to the individuals. Now, you can rule otherwise because hard cases make bad law, but that notice is there in the statute. And they had every reason, there was no basis, and we raised it at trial, there was no basis for the court to hold them liable. And since I'm focusing on the basis for holding people liable, let me talk just briefly about Janice Einoder. There is no way that Janice Einoder should have been found liable in this case. She visited that site 10 or 12 times during the time, many years that it was open, and she did so not to supervise anybody, not to control anybody. She testified she delivered some Christmas gifts and she delivered paychecks to the employees of the company that she owned, which was leasing equipment and personnel to the other company that was owned by Janice Einoder. The best they could do was to say that she signed off on hauling contracts. Well, she also testified before a permitting body as the person who was going to operate this recycling facility. But she didn't operate it. Well, but the fact that she says she didn't operate it, she held herself out as the operator. It doesn't make any difference. She didn't operate it. I mean, I don't think you can square that with the AGPRO decision. I don't think you can stare that way, I mean, with the, I forget which case it is, the Supreme Court's case on this, or maybe it's this Court's case on it. The law is very clear that simply being an officer and saying I'm going to be involved in this or I'm in charge of it or something doesn't do it. You've got to have active participation and control. You've got to direct what's going on. The cases they cite are all cases in which the individual was very actively involved in it. And the case we cite is very clear that that's not enough. I mean, it's not enough simply to be an officer or to have signed off on some contracts. She wouldn't. She did sign a lot of checks. She held herself out, again, holding herself out to the world in a certain respect. Doesn't that count for something? Well, I mean, Justice Mason's point related to some early communications with the department at the time they were opening this thing up. We're talking about conduct that spread over a period of ten years. No, probably seven or eight years. During that period, which is the period of violation, the period of operating the site without a permit, she's not involved in the operation. What do you mean by involved? She said she was only there a few times. Was that the test? Well, I mean, just showing up doesn't do it. You've got to be supervising and directing. You've got to be significantly involved in the operation of the facility. Where does it say that in the statute? I think in Madigan v. Tang is where it says it. Did it have to be significant? It says a claim of personal liability against a corporate officer under the Act requires more than alleged corporate wrongdoing. Tang stated, quote, the plaintiff must allege facts establishing that the corporate officer had personal involvement or active participation in the acts resulting in liability. That's the operation of the facility, not just that he had personal involvement or active participation in the management of the corporation. Tang is the case they have not distinguished. In contrast, the facts here are those as I've described them. In Tang, the individual had the authority to order and did not order removal of the waste from the site. And that's the same as the court's decision in City of Morris v. Community Landfill Company. The third district reversed the trial court's finding of liability against the City of Morris and nullified the penalties imposed against it because the court found that it was not an operator, even though the city owned the property where the landfill operation in question was located, helped the operator obtain performance bonds, and treated leachate from the landfill. Still, that was not enough involvement individually to be held liable. How do we interpret the fact that she signed over 200 contracts authorizing people to dump this debris or waste on the property? Well, first I take issue with the word dump, but your question has to do with the contracts that she did sign them. She was the owner of the company that was leasing equipment and personnel. Does that include involvement in this project? It involves some involvement. It doesn't involve the kind of active involvement in the violation. The active involvement in the violation is supervision and control of the site. That was John Einoder. That was John Einoder's company, Tri-State. And the argument that Janice Einoder was involved at that level is just inconsistent with the cases at City of Morris and Tang that we cited to the trial court and that we cite to this court. I think you have to really stretch it to put Janice Einoder in this thing. In fact, you know, they waited five years to sue her at all, and then when they brought her into the case, it's over the fact that she signed off on some hauling contracts? I mean, the operation here went for seven years. That's just not significant involvement by the individual. Her corporation, you know, there's a very good argument that her corporation shouldn't be held liable because it was completely under the supervision of the other company. But you haven't made that argument. We have not made that argument because I don't want to, pardon the expression, water down the argument on Janice Einoder. She just doesn't belong here. And I think Judge Billick understood that to some extent because while he was throwing $500,000 of fines and $750,000 fines at other defendants, he fined her $50,000, and then he reduced it to $28,500. So he pretty much recognized she didn't have very much to do with this. But then he left in place the mandatory injunctive relief to remove the hill, something she could not do, something Jan Einoder could not do, and something if they did do would be an environmental mess. If I could just for one second. I know you've seen it. We have in the appendix about 60 pictures of what this site looks like today. That's this massive hill that they're talking about. It's a hill. It's full of vegetation. It's got some wildlife in it. But the vegetation is the product of Mother Nature. It's not the product of anything that the companies did. That's true. But what Mother Nature gives us is the capping of the hill because of the vegetation, and that's testimony. Well, but capping is a term of art in environmental law that isn't just if it's vegetated, we'll consider it capped. I don't think. Well, when I say in the briefs that it's effectively capped, what I'm saying is that it serves the function of capping because it prevents water runoff. There's no testimony in this record that there was any damage to the surrounding environment. The state raises this issue about the 48 wells in the area that now we can assume are going to be corrupted by groundwater. Groundwater testing was ordered here. We're conducting groundwater testing, and there's a reason why they don't try to raise the issue any further than that because that's not what we're finding. In the 48 wells, the Environmental Protection Agency, that's supposed to protect the environment, didn't test one of those wells. All three years it was here. What they tried to do was test the soil that they dug those test pits. This is being recorded, if you could talk to the mic. When they tried to conduct test pits, I mean, the test pits were like 20 feet deep and 20 feet long and 10 feet wide, and they dug down there and they pulled all that stuff out, something like I think it was 12,000 cubic yards of material. They found one yard of general construction debris, which is not, by the way, hazardous. It's wood and stuff like that. 99.9% of it was clean construction and demolition debris. So that's what that hill is. It's dirt. It's rock. It's stone. It's not an environmental hazard. When you talk about ordering mandatory injunctive relief to do what cannot be done, which is to remove that hill, the first question I believe the court has to ask in exercising, if the court has the discretion to do so, the first question the court has to ask is, is it going to make a difference? Do we have to abate an environmental problem here? And the answer is no, because there is none. And there's absolutely no evidence that there is any. And on the other hand, Mr. Kerstiglub, the best Mr. Kerstiglub could say was, it's an eyesore. Well, the pictures don't reflect that it's an eyesore, but I'll show you one. That's an eyesore. That's what the sand pit looked like before they ever did any work on it. When they did this, they filled it in, and then they built a hill, and the hill has vegetation, and the vegetation effectively prevents runoff. And why do I believe very strongly that there's not a problem here in that local community? Because the local community spoke up. The mayor of Lynnville testified. The head of the multi-city area in the south suburbs testified. They said, leave it alone, don't take it down, don't make a mess. We've got a use for it. We could put windmills for energy on it. We've got to deal with a local college to do that. We've got funding from the county. And I raise that because those are factors that should be considered when you're determining what the penalty should be. Did the judge consider those factors? He heard that testimony. He heard that testimony, but there is a thing called abusive discretion. If you order the removal of a hill that can't be removed, when you've got – Well, who says it can't be removed? That's your opinion, but the court said otherwise. I have two defunct closely held corporations, and I have two people in their late 60s that live in Orland Park and House. Now, it doesn't take a leap of faith to realize that that hill is not going to be taken down by the defendants, and it never was going to be. But that's an issue that is different. Whether they have the money to pay for it or not, that's a different issue. So there's a judgment against them, or whatever happens, they can't pay for it. That's to be decided in another proceeding after this. Well, it is, but again, I go back to considering everything that's before the court at the time you're imposing the penalty. If you say, you know, the old Frank Sinatra song about the ant pushing the rubber tree plant. If you say, well, if he has high hopes, he can do it. There is no high hope here that that hill is ever going to be removed. That should be considered by the court before you order it done. And I'll tell you one reason. Let's suppose they started. Let's suppose they started to remove that hill, and they got, you know, 10% into it. They got what we call effectively capping. They got rid of that, and they dug up some, and then they just ran out of juice. Now you'd have what might be an environmental hazard, and you certainly would have had one with 48,000 trucks going back and forth. I don't see how that could be our concern. If you look at what the precedent would be, then what you're saying is if a defendant doesn't have the wherewithal to pay for whatever the judgment is, a judgment should be entered against them to remedy the situation. That makes no sense. That's a whole separate issue of the judgment and its enforcement. It shouldn't be. There's so many ways, then, that those that commit environmental hazards could escape liability just by saying, I don't have any money, and I'm old. I'm in my late 60s. Well, I take issue with that old. I do, too. But I'm just looking at the argument. Well, I concur. What about the state removing that hill and then billing the district? What about the state removing the hill? Well, they could have removed it and billed your client. They could have removed it and billed our client. You know what would have happened, Your Honor? They wouldn't have gotten paid. They would have had an IOU out there, and the state doesn't have the money to pay Medicaid right now. It's hardly going to spend money removing that hill. It would have cost $50 million or something. The state's never going to remove that hill. If John and Janice Einholder drop dead tomorrow, that hill's going to be there forever. If they don't drop dead tomorrow, that hill's going to be there forever. So no matter what we do, the hill may be there forever. But that's not the issue before us. All right. Then let me crystallize the issue as a legal issue. At the time this site was being operated and at the time this site was closed, affirmative injunctive relief to remove the material was not permitted under Illinois law. The court was not permitted to order it. The court tried to order it in the – is it Agpro? Yes. Agpro. In the Agpro case. The court tried to – the court ordered it removed. In the Agpro case, the Supreme Court said no. The statute is prohibitive only unless it's toxic material, because that comes into a different section, but this clearly isn't. And so Agpro decides that. So the EPA goes down to Springfield and gets a bill passed that calls for mandatory injunctive relief. We can remove it. And then they go back to the Supreme Court. The Supreme Court says no. You can't do it retroactively. Right, but that's in that case. In this case, there hadn't been any trial until after the amendment. But the amendment followed the activity. The activity ended in 2003. The amendment occurred in 2005. Yeah, but the remedy – it's only a remedy. And the remedy wasn't determined until there's a trial. And the trial didn't occur until 2008. Then the Supreme Court and Agpro could have remanded it for another trial, but they didn't. But that would have been – but Agpro – it's a different situation because in Agpro, the legislation would have affected a case that already had been decided by the court. In our case, there hadn't been any decision by a court. The case was simply pending at the time that the law was changed. The fact that the – I think what you're saying is that if it's a remedy, it's procedural. And that is not what Agpro stands for. If that were the case, it would have been procedural, and the court would have held that you can apply it retroactively. I mean, Agpro is – No, but they weren't – again, the difference is that in Agpro, there had already been a judgment entered by a court. That's a big difference, a tremendous difference. There is no judgment here. You're saying that unless the case was filed after the amendment, there couldn't be the mandatory injunctive relief sought. And what I'm saying is that unless there was a trial and a judgment entered, that would prohibit it. Because then the legislature is changing. You know, that's involving different areas of government. And that, to me, is what the Agpro case is talking about. But in this case, there hadn't been any trial yet. It's simply what was the remedy. And the legislature very quickly said, oh, the court got it wrong, so we want to make it correct for future cases. And they made the change and had it apply immediately. When the law was adopted, it applied. Well, you want to focus on the date of judgment. I think you have to focus either on the date of the activity, the date of closure, or at least the date you filed the lawsuit. The lawsuit had been pending for five years before they amended that remedy. So what? But there's still time. It was before trial. So, again, it's a remedy, and it's before trial. And, I mean, if you read closely, to me, reading the Agpro, it doesn't say that with regard to our case where there hasn't been any kind of judgment. This is just a pending case. So you're saying if the case was filed in 2004, a day before the amendment, that that remedy wasn't available? That's your argument? Well, the remedy, if we were still operating as we were when they filed this case, you wouldn't necessarily look at the filing date. But the operation stopped two years before the amendment was passed. What does the operation have to do with the remedy of removing the material? Because the remedy is a sanction for what you have done, and they changed the rules. It's like if somebody was charged with attempted murder, and you changed it for capital punishment while the case was pending. I don't believe you can do that. It's a remedy. And they would change the remedy, and suddenly the person who had committed the crime is now sanctioned under the new statute and can go to the chair for it. I believe the Agpro decision, and I think it's the other case that we cited here, and I just had it on mind, I think it's Commonwealth Edison. I think they make it pretty clear that you can't apply that remedy retroactively. That's all we're saying. In order to go with the state here, you have to hold, first of all, that we needed a permit, and second of all, that the relief that would be permitted if we were required to have a permit would include removal of a hill. And thirdly, of course, you've got to hold that it wouldn't be an abuse of discretion for the trial court to order that remedy when it certainly could not be performed. It can't be performed. It's not just that they're out of money. It can't be performed by these defendants. What does it mean when Agpro, the court said, for the following reasons, we conclude Roth, which is one of the cases that the defendant there cited, precludes giving the recent amendment controlling weight. So controlling weight is a lot different than saying it doesn't apply. And that's the words they used. All right, Your Honor. I've used up my time. Do you have an answer to the question, though? Pardon me? Do you have a response to my question? The response to my question is that that doesn't control the issue of whether or not you can change the rules in midstream and impose a remedy for conduct that you've already ceased performing well after the lawsuit was filed and the charges were made. I just don't think you can hold up to that. I think there are a couple of other issues that I tried to roughly touch on, but we're out of time. Although I must say the monetary penalties here, as I pointed out with respect to Janice Einoder, particularly with respect to Janice Einoder, ironically the one that had the lowest penalty, the very fact that she had a $27,000 or $28,000 penalty, distinguishing her from the other defendants really reflects the trial court's understanding that she had very little to do with this and she should not have been found liable in this case. She shouldn't have been charged in this case. Thank you very much. Mr. Legner. Good morning, Your Honors, and may it please the Court. Counsel. Mr. Legner, on behalf of the plaintiff. When are you waiting? It's going to come again. This is only a test. Has there been an actual incident to be issued for instruction via the public assessment system? Once again, does the Hawaii State Police conduct such tests? This is only a test. Has there been an actual incident to be issued for instruction via the public assessment system? This is only a test. I think there was only a test. Glad to hear it. Mr. Legner, on behalf of the plaintiff, I believe. Your Honors, this is not a bucolic hill with lush vegetation. This is an unpermitted, illegally dumped waste pile that is overgrown, that has never been subject to any permitting, that has never been properly inspected to the extent we don't even know what's under there. When you say it hasn't been properly inspected, at least since the filing of the lawsuit, the state has had the ability to go in and test for whatever it wants to do with the site, right? That's true. That's definitely true. And we know for sure that there is a lot, thousands and thousands of cubic yards of clean construction debris in there. That's true. There was also some testing done that revealed general construction debris in there. When those tests came out, John A. Noder tried to bribe the engineer to remove those results from the test. I'm offering a stack of cash, a truck, and a trip to Florida. But the state's position, that aside, is that the presence of general construction debris isn't determinative here. It's the fact that the site went above grade. That's absolutely correct. These violations, the violations which the court found after the bench trial, are predicated upon the presence of the above grade CCDD. You're absolutely right. So going to the chase. Sure. What about the change in the relief as a result of the Ryan case? What is your response to whether we should consider the mandatory injunctive relief or not? Sure, Your Honor. Thank you. 42E does now authorize mandatory injunctive relief. That provision applies retroactively. It's the law in Illinois that remedial provisions are to be given retroactive application unless they impact some vested right. And that's the Duggan case, for instance, that we cite in our brief. Additionally, the provisions of the Environmental Protection Act are to be given retroactive effect. That is the holding of the state oil case. You know, the legislature is very good at articulating when it considers a statute retroactive. It uses language to the effect that this amendment shall apply to all cases pending on or after its effective date. And they didn't do that here. That's true. They just said the amendment takes place upon enactment. That's true, Your Honor. That's absolutely true. But the legislature is also deemed to understand that remedial amendments are applied retroactively. The legislature is also deemed to understand that given the construction by the court, such as state oil, of the purpose of the Environmental Protection Act, the amendments to that statute are generally applied retroactively. So the legislature knew all that as well when they were implementing or amending Section 42E. Additionally, and as Your Honor, Justice Hyman was pointing out, the AGPRO decision is distinguishable in this case. By the time the Supreme Court in AGPRO decided not to apply 42E retroactively, it was doing so based on a separation of powers analysis. And that was because the appellate court had already ruled that in that case, in that very case, that 42E did not apply retroactively. The General Assembly changed that. And the Supreme Court in AGPRO said, look, the General Assembly does not have the power to retroactively overrule a judgment that's already been given in a particular case. AGPRO was dealing with an argument that this amendment that has happened midstream during the course of the AGPRO litigation should change the appellate court's result in AGPRO. That is what the Supreme Court, and that was the basis of the rationale of the Roth decision that AGPRO was relying on. That is the basis of the separation of powers concerns. There's no doubt. But, again, separation of powers aside, if an amendment to existing law is deemed substantive rather than procedural, it's generally not given retroactive effect. And if prior to the amendment to 42E, the power of the court was to restrain ongoing violations, did not include under AGPRO the ability to enter a mandatory injunction to abate the violations, how is that not substantive? Because it refers to the remedy. And a remedy that can be given based on a substantive violation is in a separate class. And, again, the appellate court can Remedies are always procedural and not substantive? Remedies are, well, I don't necessarily want to say always, but in this situation it certainly is. And I think it's clear in the sense of this. The substantive violations are you can't dump CCDD above grade without a permit. That's the substantive. So the substantive violations concern what you can do on your land. The remedial provisions, that goes to the procedure of how to, you know, correct those violations. Those aren't the substantive rights of the parties. That's the procedure to how to dispel the violations, how to address the violations, I think, in the language of the statutes. And that's what the Duggan court, the second district in Duggan, was getting at when it said, look, provisions that are remedial, that affect a party's remedies, those are generally retroactive. The General Assembly said, look, we can presume that when a remedy is affected, that is intended to apply going backwards. It's okay to do that. And it's not in contrary to the Kaveny v. Bower test, which is the general retroactive or not test that the courts apply here. But the effect in this case is bifurcated case. Yes. So the injunctive relief had no effect on the case-in-chief with regarding to the violation itself. Exactly, Your Honor. So I think that the case-in-chief concerned with the liability finding is concerned with the substantive rights. Right. So the substantive rights, the injunctive relief had no effect, wasn't involved. It was only when we want the court had to determine what the remedy was. Right. Which is a whole different issue. I agree. It didn't affect the substantive rights. I agree, Your Honor. I agree. Additionally, and sticking with the issue of the remedy for a moment, defendant's speculation as to what may happen when they try to remove the waste pile is not a reason to forgo providing a remedy as required in the statute. Well, it wasn't exactly speculation. There was a lot of testimony as to what the side effects of removing this hill would be, right? That's true. And the trial court heard that testimony and made its decision in its broad discretion. So despite the fact of some testimony as to the side effects of what would happen, the court still made the decision, and I don't think that the testimony was so compelling that we could say, that one could say that the trial court acted irrationally such that it did abuse its substantial discretion. Additionally. Well, what was it, rational when there's not going to be enough money? I mean, millions of dollars are needed, and it's going to take years, according to the testimony, to remove this waste. And so the State's not going to pay for it. What are we doing here? I mean, as counsel said, it could be a worse situation. If you take off 10 percent, nobody can pay for it, you have this open sore, that's a lot worse. We don't know if the State's going to go ahead and have this removed as a result of this judgment. Isn't that, under the testimony we've heard, we've got Linwood's mayor and other things saying that it could be a lot worse? Yes, Your Honor. There is testimony to that effect. That doesn't mean the decision is irrational, especially considering the standard scrap case, which specifically says that a party cannot argue that because it decided to forgo the cost of complying with environmental regulations, when it comes time to remediate those environmental regulations, it cannot argue that I'll be put out of business or I don't have the money. That's not the way to argue that. If. It's irrelevant as to whether they have the money or not. Isn't that a factor that should be considered by the Court? You're saying it shouldn't be a factor at all? That's correct. And the standard scrap makes that clear. Additionally, the notion that, the argument that the waste pile should be left there depends on the subject matter that it's effectively capped. And they choose their words carefully, and it's important. This is a waste pile that constitutes, that meets the definition of a landfill under the Environmental Protection Act. To cap a landfill, there's an extensive permitting process that requires, among other things, a financial assurance guaranteeing that there will be continual monitoring of the landfill far into the future. But they're not contesting monitoring groundwater, right? They're not contesting monitoring groundwater. That's true. But they also haven't shown that the method of regulation is requiring, for instance, that the landfill is sealed. There's certainly liner requirements for landfills, among other things. Water pollution. The State never urged that as an alternative to removing the hill. The State just said, we want the hill gone. That's true. But if they're going to make the argument that the landfill is safe and effectively capped, when it is a landfill, they still would need to show that it meets the requirements of a landfill, or the protections of a landfill, that it's gone through all the necessary requirements. There's much litigation. There's much regulation concerning when a landfill closes, what are the protections in place for the future to make sure the landfill stays stable and does not degrade and does not release gases into the air, let alone water pollution of the nearby wells. And there's the necessity of financial assurances are required for that. That's all in the Environmental Protection Act and the Board's, regulations. None of that, none of that was provided here. We just have a statement that, well, it's effectively capped because it got overgrown. Moreover, the fact that the mayor of Linwood said, oh, we like the waste pile, is irrelevant. The General Assembly specifically allocated landfill siting decisions to specific county board or city councils in the first instance, not to one mayor coming and testifying that it was okay. And in those landfill siting proceedings, a number of criteria, statutory criteria, have to be considered and met. None of that was made here. None of those criteria were met in this case. Turning to the argument, Your Honors, that the CCDD was not regulated at the time of the active period for this landfill. Defendant's argument is essentially a misdirection. Pre-2005, the Act prevented, or prohibited, the unpermitted disposal of waste, of waste. At that time, CCDD was considered waste except if it was below grade, if it was used as fill That was the existence of the law before 2005. So in other words, above grade or above ground CCDD was considered waste, and the Act certainly regulated waste. All of the prohibitions, or virtually all of the prohibitions of Section 21 of the Act, concern dumping waste, piling up waste, improper disposal of storage of waste. The amendment that defendants rely on concern closing a, quote, loophole, as they refer to, that required a CCDD permit for CCDD that's used as fill, i.e., the CCDD that was not considered waste already under the statute. In 2005, the General Assembly determined, well, for that non-waste CCDD, you need a CCDD permit, which is very different than the landfill permit that you would need for the above ground CCDD that was already, which requirement was already in existence at that time. Additionally, Your Honor, defendants do not contest that the doctrine of corporate liability applies in this case. They argue that the evidence is insufficient to show that Jan has had the requisite active involvement. But I'd like to remind the Court, and defendants completely ignore this fact, that this is reviewed for a manifestly erroneous finding. The Circuit Court took the evidence, judged the credibility of the witnesses. In fact, in the liability finding, even wrote that Janice's testimony was unconvincing at times. Yet they asked this Court to ignore all the evidence of Janice's participation, active physically was there 10 to 12 times, and she did not physically unload the trucks. Well, they said that she wasn't involved in the operation. They say she wasn't involved in the operation, but that's a legal conclusion that doesn't bear out compared to the facts, especially the facts as found by the Circuit Court, to which we give substantial deference. Among other things, she signed 273 contracts telling haulers, go ahead and dump your CCDD at the site. She established that the site was the Ellis Island for CCDD. Bring it all here. I've signed 273 contracts specifically allowing you to bring this waste here. She knew it wasn't permitted. She knew it was piling up. Anybody visiting the site once, let alone 10 to 12 times, can see a waste pile building up above ground. And in the first case where this Court, the Illinois Courts acknowledge the corporate liability doctrine, it relied on a federal case called Northeast Pharmaceuticals. In that case, the Court found that the President had actively or had specifically permitted the disposal of waste on the property. And that's what Janice did when she specifically signed 273 contracts authorizing haulers to come and bring their loads of CCDD and drop it on this land. Additionally, as your honors pointed out, Janice held herself out as actually operating a facility, both to a zoning board as well as to get credit, to be accredited as a woman-owned business enterprise. She made specific statements that she was operating this facility and that she was operating the waste disposal, JTE's waste disposal business. Moreover, Janice corresponded with the agency about permits and met with the agency about, went to IEPA meetings concerning other permits and the requirements. I'll just touch very briefly then, your honors, on the issue of what they claim to be jurisdiction, the notice issue, the Section 31 argument. First, Section 31 does not require an agency notice and going through the informal process in order for the Attorney General to bring a civil action. Section 42 of the Act says that the Attorney General may, via referral from the agency or on her own motion, or on her own motion, file an action. And that makes sense. The General Assembly realized that or provided for a couple different paths to action against environmental harm. The agency and its investigation and informal process is one way, but the Attorney General and her investigation and process is another way. And that makes sense given the broad, remedial purpose of the Act. Moreover, Section 31, even if it did apply, is not a subject matter jurisdiction statute. It provides notice, but this Court and the Supreme Court have held that the failure to provide notice, the failure to comply with statutory notice requirements is not a matter of subject matter jurisdiction. Those are generally in Juvenile Court Act proceedings, but the point is that when the Court has a justiciable controversy before it, such as this case, it has subject matter jurisdiction. And the failure of statutory notice is not of a jurisdictional magnitude. Moreover, the argument that John and Janice had no notice does not make a lot of sense. They met with the EPA. When JTE and Tri-State received notice. But their point is, we understood that they were filing violation notices against the corporations. We didn't understand that they were going to go after us personally. And so if their point is that we would have tried harder if we knew that we were personally liable, that's not particularly persuasive given the purposes of the Act. The purposes of the Act isn't necessarily to let individuals know that they may be liable themselves. The purpose of the Act is to stop environmental destruction and to remediate environmental harms. Moreover, this construction of the statute, allowing for the Attorney General to bring an action on her own motion, irregardless of notice by the IEPA, makes sense, as specifically seen on the facts of this case. They are right. The complaint wasn't amended to bring in John and Janice individually until five years into this litigation, because it wasn't until then that the Attorney General got enough discovery to realize, hey, wait a minute, we should bring the individuals in as well. At that point. Well, these were wholly owned corporations. These were wholly owned. John and Janice, they owned 100 percent of both of them. That's absolutely true, Your Honor. But as they point out, simply being the owner is not enough. It is who is actually making the decision and who is participating in it and who is doing what with regard to the specific violations. So they couldn't assume at that point. But then once they get into the litigation and once they've gone through discovery and once they've made this determination, it would be a pretty absurd result then to put everything on hold and require the EPA to go through the notice and informal process at that point, after you've already been in court for five years. Anything further? Other than please affirm the circuit court, except in the narrow circumstance that we raise in our cross-appeal. Thank you very much, Your Honors. Any other short reply? Thank you. I've used my time, so I'll be brief. Standard SCRAP stands for the proposition that you can't say, if you make me do this, it will put me out of business. Our argument is quite different than that. Our argument is that in the context of exercising discretion, you can't impose a remedy such as the removal of the hill if it can't be done. It just doesn't square with reality. So when we raise the point about the cost associated with it being what keeps it from being done, rather than the cost associated with it causing you to go broke, that's standard SCRAP. That's not what we're talking about here. I'd like to point out to you, counsel says they didn't really know what was going on for five years after they filed this case with respect to Jan and John Einoder. That's just not credible. I'll leave it at that. The fact of the matter is the state came in, I think in 2001, sought a TRO, got a TRO that said we're supposed to comply with the act, and denied the TRO in other respects. And then they continued for two years to accept thousands of truckloads of CCD. Right, because what the state didn't, I mean, in the first place, the TRO was designed primarily to argue that we were bringing general construction and demolition debris to the site, even though they should have known from their previous inspection that that wasn't the case, or at least it was being removed if we brought it to the site. But then the TRO was entered, and the language of the TRO was denied in part and was granted in part. It didn't say cease operations. It didn't say you can't bring any more clean C&D to the site. In very general terms, it says don't do anything that violates the act. That didn't solve anybody's problem. The point of the matter is, since everybody knows that we're violating the act by bringing clean construction and demolition debris there without a permit, one would think that sometime after 2001, when the TRO was entered, the state would have come in to enforce it. They didn't even follow up with a motion for preliminary injunction. They never went back to court on that. But they did go back to the site. They did inspect the site on numerous occasions, and they wrote us up for things like, we found some general construction and demolition debris here. We found some oil from one of your trucks here. That's what they were citing us for. Now, I'm not saying we were lulled into believing that we would continue operation. There was a contested issue here. But it wasn't a contested issue in the sense that we were flaunting the law, as they've tried to suggest. On Janus I-Notor, the court, we've cited this at page 20, when the court finally focused, or did focus on Janus I-Notor, it found that the site was operated under the direction and control of John Eder, quote, the sole owner and officer of Tri-State, who was involved in the day-to-day operations of this company during the relevant period. The evidence has shown that John I-Notor, not only managed Tri-State, but also participated in the day-to-day operations of JTI-Notor pertaining to the site. No such finding was made as to Janus I-Notor. That's the standard. The judge had it right as to John I-Notor. We've never challenged that. But that's what the court held. That's what the court, in its discretion, who is the finder of fact, found, with no such finding as to Janus I-Notor. With respect to, and I'll sit down, with respect to retroactivity, Commonwealth Edison v. Polk County Collector, which we cited in our brief, states the statute does not operate retrospectively merely because it is applied in a case arising from conduct antedating the state's enactment or upsets expectations based on prior law. Rather, the court must ask whether the new provision attached new legal consequences, attached new legal consequences to events completed before its enactment. That's this. These events were completed before the enactment of that statute. That statute went into effect afterwards. Commonwealth Edison v. Polk County Collector controls. It's an Illinois Supreme Court decision, 2001. It's cited in our briefs. Lastly, with respect to Janus I-Notor, it wasn't just Janus I-Notor's credibility that was at stake here. One of their principal witnesses was a state police officer by the name of Schlashberg. Schlashberg was all over this case. He was assisting in the enforcement with the EPA. They called him as a witness for a reason. He had first-hand knowledge. Schlashberg's most significant testimony was Janus I-Notor had nothing to do with the operation of the site. That's their witness. It's not Janus I-Notor and her credibility that's at stake here. On the issue of Janus I-Notor, with all due respect, the circuit court blew it. She shouldn't be in the case. She shouldn't have been fined. She sure shouldn't have a life sentence imposed on her to remove a hill that she'll never remove. Thank you very much. Thank you very much. Thank you, Mr. Legner. Thank you, Mr. Prendergast. Thank you for your excellent briefs and excellent arguments. We'll take a very brief recess.